**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **KATHLEEN M. MINAHAN,** | ) | **CASE NO. 07 CV 2505** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LESCO, INC.,** *et al.,* | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |


<u>**INTRODUCTION**</u>

This matter is before the Court on four motions for summary judgment:  (1) Plaintiff's

Motion for Summary Judgment on Count III of her First Amended Complaint (Doc. 42); (2)

Defendants' Motion for Summary Judgment on Counts I and II of Plaintiff's First Amended

Complaint (Doc. 59); (3) Defendant LESCO, Inc.'s Motion for Summary Judgment on Counts

II and III of its Second Amended Counterclaim (Doc. 63); and (4) Plaintiff's Motion for

Summary Judgment on Counts I and II of her First Amended Complaint and for Summary

Judgment on Counts I, II and III of Defendants' Second Amended Counterclaim (Doc. 66).

This case arises out of plaintiff's former employment with defendant LESCO, Inc.

For the reasons that follow, plaintiff's motion for summary judgment on Count III of her First Amended Complaint is GRANTED.

Defendants' motion for summary judgment on Counts I and II of plaintiff's First Amended Complaint is GRANTED as to Count I and DENIED as to Count II.

LESCO's motion for summary judgment on Counts II and III of its Second Amended Counterclaim is GRANTED in PART and DENIED in PART as to Count II and DENIED as to Count III.

Plaintiff's motion for summary judgment on Counts I and II of her First Amended Complaint and Counts I, II and III of defendants' Second Amended Counterclaim is DENIED as to Count I and GRANTED as to Count II of her First Amended Complaint and GRANTED as to Count I, GRANTED in PART and DENIED in PART as to Count II and GRANTED as to Count III of defendants' Second Amended Counterclaim.

**FACTS**

Plaintiff Kathleen M. Minahan brings this action against LESCO, Inc. ("LESCO") and the LESCO, Inc. Employment Retention Plan (the "Plan Defendant" and, together with LESCO, "defendants") seeking severance payments and other benefits allegedly due under various agreements between plaintiff and LESCO.

LESCO hired plaintiff as Senior Corporate Counsel on March 15, 2004.  In anticipation of this employment, plaintiff and LESCO entered into an Agreement for Officers, Zone Vice Presidents, Key Executives and National Account (the "2004 Officers' Agreement") on or about March 3, 2004.  The 2004 Officers' Agreement provides in relevant part:

2

3.    EMPLOYEE'S    ACKNOWLEDGMENTS    AND

COVENANTS

   (b)    Non-Solicitation of Employees.    While Employee is
employed by Employer, and for twenty-four (24) months after
such employment ends for any reason, Employee, acting either
directly or indirectly, or through any other person, firm, or
corporation, will not induce or attempt to induce or influence any
employee of Employer to terminate employment with Employer
when Employer desires to retain that person's services.

***

  (d) Return of Confidential Materials and Information. Employee
agrees that whenever Employee's employment with Employer
ends for any reason, all documents containing or referring to
Employer's Confidential Materials and Information as may be in
Employee's possession, or over which Employee may have
control, will be delivered by Employee to Employer immediately,
with no request being required.

2004 Officers' Agreement at 1-2.

Shortly after her employment began, plaintiff was appointed by LESCO's Board of

Directors to the position of Assistant Secretary.  LESCO was a publicly traded company on

the NASDAQ stock exchange.  As Assistant Secretary, plaintiff was considered an "officer"

of the company and, as such, was subject to heightened obligations and duties.  Accordingly,

on or about August 6, 2004, plaintiff and LESCO entered into an Indemnification Agreement.

The Indemnification Agreement provides generally that LESCO will indemnify plaintiff

against costs reasonably incurred in connection with any action resulting from plaintiff's

service as a director or officer.

In October or November of 2005, plaintiff was promoted to Vice President, General

Counsel and Secretary of LESCO.  Plaintiff and LESCO then entered into a second

Agreement for Officers, Zone Vice Presidents, Key Executives and National Account

3

Associates on or about November 9, 2005 (the "2005 Officers' Agreement").  The provisions

of the 2005 Officers' Agreement relating to non-solicitation of employees and return of

confidential materials are identical to those contained in the 2004 Officers' Agreement recited

above.

In May or June of 2006, plaintiff assumed responsibility for LESCO's Human

Resources ("HR") Department and was accordingly given the additional title of Chief

Administrative Officer.  Thus, as of this time, plaintiff was Vice President, Chief

Administrative Officer, General Counsel and Secretary (hereinafter "General Counsel").

In September of 2006, Deere & Company ("Deere") contacted LESCO for the purpose

of discussing a potential merger.  Plaintiff became aware of the merger in about November

2006.  LESCO and Deere entered into an Agreement and Plan of Merger ("Merger

Agreement") on February 19, 2007.  The Merger Agreement provided that Deere Merger Sub,

Inc., a wholly-owned subsidiary of Deere, would merge with and into LESCO.  LESCO

continued as the surviving corporation to the merger but was "de-listed" from the NASDAQ

(as a result of the merger, LESCO became a wholly-owned subsidiary of parent company

Deere).  The Merger Agreement further provided that "the officers of [Deere] Merger Sub

immediately prior to [the effective date of the merger] shall be the initial officers of the

Surviving Corporation [LESCO] and shall hold office until their respective successors are

duly elected and qualified, or until their death, resignation or removal."  Merger Agreement,

Section 1.7.

Also on or about February 19, 2007, LESCO adopted the LESCO, Inc. Employment

Retention Plan (the "Retention Plan").  The Retention Plan was drafted after LESCO's Board

4

of Directors had reviewed a draft of the Merger Agreement, including Section 1.7 quoted above regarding the initial officers of the post-merger company.  The Retention Plan provides in relevant part:

> The Company's Board of Directors (the "Board") has determined that it is in the best interest of the Company and its shareholders to provide certain employees with additional incentives during a Change in Control Period (as defined below) to provide their continued dedication to the Company notwithstanding the possibility, threat, or occurrence of a transaction resulting in the Company's Change in Control (as defined below), due to the uncertainties and risks that a Change in Control could pose for such employees.
>
> The LESCO, Inc. Employment Retention Plan (the "Plan") has been established by LESCO, Inc. (the "Company") for the purpose of providing certain of its employees with incentives to continue employment with the Company on an objective and impartial basis in the event of the Company's Change in Control.
>
> The terms and conditions of the Plan applicable to each employee identified by the Board as eligible for a benefit under the Plan are set forth below.  In addition, certain other benefits for which an employee may be eligible in accordance with the terms of the Plan shall be established and provided for in an Employment Retention Agreement (the "Agreement") between the Company and such employee.
>
> ***
>
> In the event a Plan term and a term in the Agreement conflict, the Plan's terms shall control.
>
> ARTICLE I
> DEFINITIONS
> ***
>
> 4.  "Change in Control Period" is the period set forth in the Employee's Agreement, which shall commence on the Effective Date and end on the date established in such Agreement.
>
> 9.  "Effective Date" means the first date during the Term of the Agreement (as defined herein) on which a Change in Control occurs.
>
> 11.  "Good Reason" means:

5

(a)  the assignment to the Employee of any duties inconsistent in any material respect with the Employee's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities, or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Employee;

\*\*\*

(e)  ... any good faith determination of "Good Reason" made by the Employee shall be conclusive.

\*\*\*

16.  "Term of the Agreement" shall mean the period in which the Agreement shall remain in effect between the Company and the Employee.  The Term of the Agreement shall be set forth in each Employee's Agreement.

17.  A "Triggering Event" for the purpose of this Plan will be deemed to have occurred if the Employee experiences a Separation from Service during the Change in Control Period under any one of the following conditions:

\*\*\*

(b)  subject to the conditions set forth in Section I(12), the Employee's Separation from Service is voluntary and for Good Reason ...

\*\*\*

## ARTICLE II
## SEVERANCE BENEFITS

Upon the occurrence of a Triggering Event, the Company shall make [various payments to the Employee].

\*\*\*

## ARTICLE III
## SETOFF

No amounts otherwise due or payable under this Plan will be subject to setoff or counterclaim by either party hereto.

## ARTICLE IV
## FULL SETTLEMENT & ATTORNEY'S FEES

The Company's obligation to make the payments provided for in the Plan and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against the Employee or others.  ...  The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and

6

> expenses which the Employee may reasonably incur as a result of
> any contest (regardless of the outcome thereof) by the Company,
> the Employee or others of the validity or enforceability of, or
> liability under, any provision of the Plan or any guarantee of
> performance thereof (including as a result of any contest by the
> Employee about the amount of any payment pursuant to this
> Agreement), plus in each case interest on any delayed payment at
> the applicable Federal rate provided for in Code Section
> 7872(f)(2)(A) ...  Notwithstanding the foregoing to the contrary,
> the Company shall not pay fees in excess of $100,000.

Retention Plan at 1-8.  This form of retention plan is termed a "double trigger" plan in that it requires two conditions to be triggered:  a "Change in Control" and a "Triggering Event."[1]  A simple Change in Control is insufficient to trigger the operative provisions of the plan. Plaintiff was named in Appendix A to the Retention Plan as an eligible employee.  She also had a role in drafting the Retention Plan.

On or about February 19, 2007, plaintiff and LESCO also entered into an individual Employment Retention Agreement as provided for in the Retention Plan.  While the Retention Plan provides generally for the payment of certain benefits, each eligible employee's individual Employment Retention Agreement sets forth the specific terms of the agreement as to that particular employee.  Plaintiff's Employment Retention Agreement states:

> 1.  INTRODUCTION
> ... All terms capitalized throughout [this] Agreement shall have
> the meaning set forth in the [Retention] Plan, unless otherwise
> specifically provided for herein.
> ***
> 2.  TERM OF AGREEMENT
>   The Term of the Agreement shall be the period commencing on
> the Effective Date [*i.e.*, the first date on which a Change in
> Control occurs] and ending on the date that is the earlier of the

---

[1]

> This type of severance plan, contingent at least in part upon a change
> in control, is also commonly referred to as a "golden parachute."

7

Employee's Separation from Service or the first anniversary of the Effective Date.

3.  CHANGE IN CONTROL PERIOD
   Change in Control Period shall mean the period commencing with the Effective Date and ending on the date that ends eighteen (18) months after such Effective Date.

4.  SEVERANCE PAYMENTS
   (a)  Upon the occurrence of a Triggering Event [this term having the meaning set forth in the Retention Plan], Company shall pay to Employee [certain amounts set forth in the Employment Retention Agreement and in addition to those set forth in the Retention Plan].

Employment Retention Agreement at 1.

The merger between Deere Merger Sub, Inc. and LESCO was completed on May 7, 2007.  A "legal download" meeting was scheduled for May 10 between Deere and LESCO executives to assist in the transition of duties after the merger.  Plaintiff was asked to attend the meeting.  She did not.

Plaintiff tendered her resignation on May 7, 2007.  Her resignation letter states:

Effective with closing, I am no longer Secretary to the Board of Directors, and my position, status and authority as an executive officer of this Company was stripped.  It is already apparent that I no longer have authority over human resource matters.  Without having consulted me for approval, Kim Chadwick, V.P. of Human Resources for John Deere Landscapes ("JDL"), is scheduled to meet tomorrow with the associates in my departments and announce decisions about their future employment.  I understand that reporting structure and employment decisions affecting other departments have already been communicated to the Company's associates by JDL's S.V.P., Jeff Lanahan and others.

Defendants failed to provide plaintiff with any severance benefits under the Retention Plan or Employment Retention Agreement.  The severance benefits seem to total approximately $300,000.  This suit followed.

8

Plaintiff's First Amended Complaint states a claim for breach of the Retention Plan and the Employment Retention Agreement by LESCO (Count I), violation of the Employee Retirement Income Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for failure to pay benefits (Count II) and violation of 29 U.S.C. § 1132(a)(1)(B) for failure to pay attorneys' fees as they are incurred and specific performance of the Retention Plan and Employment Retention Agreement pursuant to 29 U.S.C. § 1132(a)(3) (Count III).[2]

Defendants' Second Amended Counterclaim asserts a claim for a declaratory judgment that there was no "Triggering Event" and that plaintiff did not resign for "Good Reason" (Count I), breach of the 2004 and 2005 Officers' Agreements (Count II) and common law breach of fiduciary duty (Count III).

Plaintiff now moves for summary judgment on Counts I, II and III of her First Amended Complaint and for summary judgment on Counts I, II and III of defendants' Second Amended Counterclaim.  Defendants move for summary judgment on Counts I and II of plaintiff's First Amended Complaint.  Defendant LESCO also moves for summary judgment on Counts II and III of its Second Amended Counterclaim.  Each motion is opposed.

**STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and

---

[2]

It appears that plaintiff has also attempted to assert a "Counterclaim" against LESCO for breach of the Indemnification Agreement and seeking declaratory judgments stating her right to indemnity and right to payment of costs and expenses under the Officers' Agreements. This claim appears with plaintiff's Answer to LESCO's Counterclaim (Doc. 10).  It is not repeated in her later pleadings and, in any event, it is not a proper pleading.  Accordingly, it will be disregarded.

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. United*

*Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence

of any such genuine issues of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if its

resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).  The court must afford all reasonable inferences and construe the

evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of*

*Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 255); *see also United*

*States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Summary judgment is appropriate when a party who bears the burden of proof at trial

fails to make a showing sufficient to establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). When the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252).  Moreover, if the evidence is "merely colorable" or is not "significantly probative," the court may grant summary judgment.  *Anderson*, 477 U.S. at 249-50.  On cross-motions for summary judgment, the Court "must evaluate each motion on its own merits."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

**DISCUSSION**

**A.**     **Count I of Plaintiff's First Amended Complaint - Breach of Contract**

Defendants move for summary judgment on Count I of plaintiff's First Amended Complaint (Doc. 59).  Plaintiff also seeks summary judgment on this count (Doc. 66). Plaintiff alleges that LESCO breached the Retention Plan and Employment Retention Agreement by failing to pay her severance benefits.  Defendants state that the Retention Plan is governed by ERISA; therefore, plaintiff's breach of contract claim is preempted.

Plaintiff does not oppose defendants on this ground.  She fails to address much less dispute their position that the Retention Plan is governed by ERISA.[3]  For the reasons stated

---

[3]

In her reply in support of her motion for summary judgment on Count

in defendants' briefing, the Court grants defendants' motion for summary judgment on Count

I of plaintiff's First Amended Complaint for breach of contract and denies plaintiff's motion

for summary judgment on this same count.

**B.      Count II of Plaintiff's First Amended Complaint - Violation of ERISA**

Defendants move for summary judgment on Count II of plaintiffs' First Amended

Complaint (Doc. 59).  Plaintiff also seeks summary judgment on this count (Doc. 66).  The

allegations in this count track those of Count I except that plaintiff's theory of recovery is

premised on ERISA rather than a breach of contract.  Plaintiff alleges that defendants' failure

to provide her the benefits set forth in the Retention Plan and Employment Retention

Agreement violates 29 U.S.C. § 1132(a)(1)(B).  This provision of ERISA states that "a civil

action may be brought by a participant or beneficiary ... to recover benefits due to him under

the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights

to future benefits under the terms of the plan."

A denial of benefits under an ERISA plan is reviewed *de novo* where the challenge is

brought pursuant to Section 1132(a)(1)(B) of ERISA unless the plan gives the administrator

discretion to determine eligibility for such benefits or construe the terms of the plan.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  Neither party contends that the

Retention Plan administrator possesses such discretion.  Federal common law rules of

_____

III of her First Amended Complaint (for recovery of attorneys' fees),
plaintiff says she "does not concede" that the Retention Plan is
controlled by ERISA.  (Doc. 70).  However, she makes no argument
on the point and, as stated above, fails to address the point at all in
her briefing on Counts I and II of her First Amended Complaint (the
counts that go to the substance of her claim for severance benefits
under either a breach of contract theory or under ERISA).

12

contract interpretation are applied in determining the meaning of a term contained in an

ERISA plan.  *E.g., Univ. Hosps. v. S. Lorain Merchs. Ass'n Health & Welfare Benefit Plan &*

*Trust*, 441 F.3d 430 (6th Cir. 2000).  In developing these rules, the federal courts are guided

by both state law and general contract law principles.  *Regents of the Univ. of Michigan v.*

*Agency Rent-A-Car*, 122 F.3d 336 (6th Cir. 1997).  The general principles of contract law

dictate that courts should interpret ERISA plan provisions according to "their plain meaning,

in an ordinary and popular sense."  *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir.

1998).  Interpretation and construction of the terms of an ERISA plan is a matter of law for

the court.  *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (citing *Kemmerer v.*

*ICI Americas, Inc.*, 70 F.3d 281, 288-89 (3d Cir. 1995), *cert. denied*, 134 L. Ed. 2d 931

(1996)); *cf. Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146 (Ohio 1978) (construction of

written contract is a matter of law).

 The Retention Plan and Employment Retention Agreement each provide:  "Upon the

occurrence of a Triggering Event, the Company shall [make certain payments]."  A

Triggering Event is defined as a Separation from Service that occurs "during the Change in

Control Period" and is "voluntary and for Good Reason."  A Separation from Service is for

"Good Reason" if the Company takes "any other action ... which results in a diminution in

such position, authority, duties or responsibilities ..."  Such "position" includes "status,

offices, titles and reporting requirements."  "Any good faith determination of 'Good Reason'

made by the Employee shall be conclusive."[4]  "Where a contract provides that entitlement to

---

[4]

> Defendants argue halfheartedly that the provision regarding the
> conclusiveness of plaintiff's good faith belief does not apply to the
> definition of Good Reason that is at issue here.  The plan states that

benefits thereunder is contingent on a party's good faith determination, a court reviewing that party's good faith determination should consider not only the party's subjective reasoning but also the facts and circumstances surrounding the determination." *Worth v. Huntington Bancshares, Inc.*, 43 Ohio St. 3d 192 (Ohio 1989).

Plaintiff contends that a Triggering Event occurred upon consummation of the merger between LESCO and Deere.  She states that this Triggering Event was created by operation of the Merger Agreement - specifically, Section 1.7 of the Merger Agreement.  Section 1.7 provides that the officers of Deere Merger Sub, Inc. were to be the initial officers of the new post-merger LESCO.  Plaintiff was an officer of the old LESCO.  Once Section 1.7 took effect, she was no longer an officer.  She contends this was an "action by the Company which results in a diminution in such position, authority, duties or responsibilities."  Retention Plan, Article I, Section 11(a).  As an officer, she had certain fiduciary duties and obligations and certain powers to bind the corporation.  As a non-officer, her obligations and powers were changed by operation of law.

Defendants argue that the alleged Triggering Events occurred *prior to* the Change in Control Period - that is, LESCO took no *action* during the Change in Control Period that

----

the "good faith" provision applies to Section I(12) of the contract; however, Good Reason (which is the subject of the good faith determination) is defined not in Section I(12) but in Section I(11). The Court finds that there is a typographical error in the Retention Plan.  The Retention Plan only makes sense if the reference to Section I(12) at page 4 of the plan refers to Section I(11).  In support of this construction, plaintiff points out that the good faith provision also discusses "clauses (a)-(c) of this Section I(12)."  Section I(12) has no clauses.  Section I(11), on the other hand, does contain clauses (a)-(c).

could be viewed as a Triggering Event.  Defendants next argue that plaintiff's duties were not actually diminished.  Defendants also state that the Retention Plan was drafted after Section 1.7 was incorporated into the Merger Agreement.  As such, it is defendants' position that the drafters of the Retention Plan could not have intended for Section 1.7 of the Merger Agreement to constitute a Triggering Event.

Plaintiff further argues that she experienced a "diminution in her position, authority, duties or responsibilities" by virtue of the fact that Kim Chadwick, Deere's V.P. of Human Resources, planned to communicate decisions regarding the future employment of LESCO employees on May 8 - the day following the merger - without first consulting plaintiff.  In support of this second position, plaintiff points to a conversation she had with one of her subordinates.  This subordinate stated that a Deere employee told him that Chadwick would be visiting on May 8.  Defendants complain that this evidence is hearsay and inadmissible.

The parties provide a great deal of evidence purportedly establishing that plaintiff either did or did not in good faith believe that defendants took an action to diminish her position or duties during the Change in Control Period.  That evidence includes the following:

- Plaintiff had a role in drafting the Retention Plan.

- The Retention Plan was written by LESCO executives after a first draft of the Merger Agreement, including Section 1.7, had been circulated among LESCO executives.

- Plaintiff understood that the Retention Plan was intended to encourage LESCO executives to remain with the company after the Change in Control.

- Plaintiff understood that the Retention Plan was a "double trigger" plan and that a Change in Control alone would not trigger her benefits.

15

- LESCO CEO Jeffrey Rutherford testified at deposition that the Board of Directors designed the plan to have a "double trigger" so that the company would be more attractive to potential buyers; a "single trigger" plan would leave the buying company with no executive team in place after a change in control to assist with the transition.

- Plaintiff stated on several occasions that Deere would have to communicate to LESCO executives that they were demoted to trigger the operative provisions of the Retention Plan.

- Plaintiff was told that, for LESCO employees, it would be "business as usual" the day after the merger and that "the day after closing would look very much like the day before."

- But, in the weeks leading up to consummation of the merger, Deere - through executives David Werning and Kim Chadwick - made decisions regarding the future employment of LESCO employees in departments other than the Human Resources Department.  In some instances, plaintiff was asked to give her approval or thoughts. In other instances, it appears that Deere merely communicated to plaintiff decisions that were already made.

- On the other hand, plaintiff testified at deposition that her duties did not change in the weeks between the signing of the Merger Agreement in February 2007 and the closing in May 2007.

- On April 14, LESCO CEO Jeffrey Rutherford told plaintiff that "JD would like to talk to you about working for them.  They would like you to come to Moline [Illinois] to talk to their legal group.  I have no details."  Plaintiff declined the interview, because

16

she assumed any position with Deere would require her to move to Moline.  She also believed that Deere intended to offer her a job in Moline assuming she would turn it down and quit; then Deere would not be obligated to pay her severance benefits because she would not have been demoted or experienced a Triggering Event.

- Deere Senior Vice President David Werning testified at deposition that a position for plaintiff in Cleveland had not been ruled out as a possibility.

- Some time in April, Werning offered Rutherford a job with the post-merger LESCO at a reduced salary.  Rutherford asked if his retention plan benefits would be triggered.  Werning stated that, honestly, he had not considered the Retention Plan.

- On April 20, Rutherford allegedly drafted an email to Werning expressing his position that the closing would result in Triggering Events for several LESCO executives.  The draft message states:

> I know that you have interpreted the triggering events in paragraph 11.(a) of the Employee Retention Plan differently than our BOD and attorneys.  I have talked to our attorney and my personal attorney and we have not changed our opinion.  In fact for certain members of the executive team, the transaction will result in multiple triggering events.  Here is my concern.  If JD does not acknowledge these triggering events, the affected executives will be put in the unfortunate position to have to resign to enforce their contract.  I do not believe that is what is desired.  If there is a desire by JD to retain executives that will experience triggering events (even for a limited time period), I would suggest that you consider acknowledgment of the triggering event, arrangement for the payment of the amounts due to the executive in accordance with their individual agreement and work out individual retention agreements.

Plaintiff reviewed this draft message and made several changes.[5]  Rutherford never

---

[5]

Defendants argue that plaintiff has failed to authenticate the draft

17

sent the email.

- After looking into the issue, Werning explained to Rutherford on or about April 25 that Rutherford would be the only executive demoted immediately upon closing and that Rutherford's retention benefits would be triggered.  Rutherford passed this information on to plaintiff.

- On April 26, Rutherford held a meeting with the LESCO executive team, including plaintiff, to discuss their future employment and the Retention Plan.  Rutherford informed them that they would each remain in his or her same position for some period after closing to assist with the transition.  Because their pay and titles would stay the same, the Retention Plan would not be triggered at closing.  Plaintiff's hand-written notes from one of her conversations with Rutherford on the topic reflect this understanding as well:  "all other execs, except Paczak, will trigger but not until later ~ which date they'll give us ...  not changing our title or pay."  At the meeting, plaintiff expressed her disagreement with this interpretation, relying on the effect of Section 1.7 of the Merger Agreement.

- On April 26, plaintiff received word from Ms. Chadwick that Deere had not yet made

---

email she produced during discovery and now relies upon. Rutherford apparently does not remember creating it. The document produced by plaintiff appears to be a hard copy of an email from Rutherford to plaintiff.  It is dated 4/20/2007  11:49:26 AM.  She states it was on her BlackBerry handheld device.  After she resigned from LESCO, she downloaded it to her personal computer.  During discovery, she transferred it to a USB memory device and produced it to defendants.  The Court is satisfied that plaintiff has authenticated the email and will consider it in deciding the motions for summary judgment.

18

any final employment decisions regarding LESCO's HR personnel.

• One of plaintiff's subordinates told her that Chadwick planned to visit LESCO on May 8, the day after the merger.  The purpose of the visit was to inform employees in the HR department at LESCO that they were being laid off.

• However, Ms. Chadwick states (in a self-serving affidavit submitted in support of defendants' motion) that "[h]ad Ms. Minahan remained employed, I would have consulted with Ms. Minahan and would have informed her of any decisions regarding future employment before they were transmitted to employees."  She also states that "Deere did not make any decisions regarding the employment of human resources employees in LESCO's corporate office until after the close of the merger.  In fact, one of the reasons I planned a meeting for May 8, 2007 was to run by my tentative thoughts on staffing with LESCO's managers."  On May 8, Chadwick did in fact visit LESCO and lay off HR department employees.

• On April 27, 2007, plaintiff sent an email to Deere executive David Werning.  The email stated "no one from Deere has spoken to me about my situation at closing.  The only information available to me is ... Section 1.7 of the merger agreement ... Obviously, I am not an officer of Deere Merger Sub, so I will not be an officer of LESCO at closing -- nor will I be secretary to the board of directors of a publicly-traded company.  Any information you can provide me about my post-closing status would be appreciated."  Mr. Werning responded, "[p]lease give me a call ... and I would be happy to discuss this."

• Plaintiff and Werner spoke later that same day.  Werning told her that her salary and

19

title would remain the same after closing.  Werner also told her that she would retain her authority to make business decisions in consultation with other management officials.  He reminded her of the stated purpose of the Retention Plan and explained that he did not think her Retention Plan benefits would trigger at closing.  When plaintiff mentioned Section 1.7 of the Merger Agreement, Werner stated that this was a mere "technicality" and he did not think her job was going to change.  Werner also stated to plaintiff that the Employment Retention Agreements were "either the most poorly written agreements he had ever seen or were drafted so as to be intentionally misleading to Deere."  Plaintiff testified at deposition that the conversation made clear that she and Werning had "diametrically opposed views as to what the agreement meant."

- In late April and early May, plaintiff consulted several times with her personal attorney as to whether her Retention Plan benefits would be triggered at closing. Attorney Frantz advised plaintiff that, based on the limited information available to him, he believed a Triggering Event would occur at closing.

- At some point in late April or early May, plaintiff was asked to attend a "legal download" meeting on May 10.  Plaintiff stated she was not available.

- Either Werner or Rutherford or both informed plaintiff that if she attended the May 10 download meeting, she would then be let go and her severance benefits would be triggered.  Plaintiff asked Werner to put in writing what her duties, etc. would be after closing and/or that a Triggering Event would occur at closing.  Werner refused stating it would "set an unacceptable precedent."

20

- On May 7, 2007, the merger was consummated.  Plaintiff offered her letter of resignation immediately following the closing.  Between the time the merger closed and the submission of her resignation, plaintiff did not speak to LESCO CEO Rutherford or anybody else about her duties and responsibilities following the merger.

- The Retention Plan provides that severance benefits will not be paid if one is terminated for cause.  Plaintiff states that she feared that if she remained with Deere post-merger, they could have "fabricated" cause to terminate her, thus depriving her of the benefits she felt she was due.  She states she did not want to take that chance and felt she was not obligated to given her belief that a Triggering Event occurred at closing.

- Plaintiff is the only LESCO employee who was eligible for severance pay who did not receive it.

- Two of the officers of the pre-merger LESCO eventually were made officers of the post-merger LESCO.

Defendants point to all of this evidence in support of their argument that plaintiff did not act in good faith, that her duties were not diminished, that LESCO took no action to diminish her position after the merger was consummated and that the drafters of the Retention Plan could not have intended for a "double-trigger" plan to be triggered by operation of the Merger Agreement.  Defendants arguments are unavailing for the simple reason that the Retention Plan is very clear on its face as to what will constitute a Triggering Event.

The facts undisputably establish that plaintiff was no longer Secretary of LESCO.  Whether or not she was told that her job duties and pay would stay the same, the fact remains

21

that she was no longer an officer.  Under the clear wording of the Retention Plan, there was an action by the Company (by virtue of operation of the Merger Agreement) that resulted in a diminution of plaintiff's office and title.  There can be no dispute that her benefits were triggered at closing, after which time she was no longer the Secretary of LESCO.  Defendants cannot prevail on their argument that there was no "action" taken "during" the Change in Control Period.

Moreover, defendants cannot now speculate on what the drafters of the plan intended it to mean; the plan's terms are clear.  The fact that plaintiff may not have acted in the most professional manner is irrelevant.  The fact that the plan may have been poorly drafted is irrelevant.  It is enough that LESCO's Board of Directors, after receiving a buy-out bid from Deere, chose to draft the Retention Plan that they did.  Plaintiff's statements as to whether she thought Deere would have to demote her after closing are also irrelevant.  Her opinion or interpretation of the Retention Plan cannot change its meaning as dictated by the terms of the plan itself.  Given the clear meaning of the terms of the Retention Plan, plaintiff did in good faith determine that Good Reason existed for her Separation from Service and a Triggering Event had occurred.[6]

The cases relied upon by defendants are distinguishable on their facts.[7]  In *Carter v.*

---

[6]
>Defendants complain that plaintiff's affidavit submitted in support of her motion is largely self-serving.  The Court agrees and has not relied on the affidavit in reaching its decision on this or any of the motions for summary judgment.  *E.g., Bsharah v. Eltra Corp.*, 394 F.2d 502 (6th Cir. 1968).

[7]
>*Bader v. RHI Refractories Am., Inc.*, 111 Fed. Appx. 117 (3d Cir. 2004), is distinguishable, because it was reviewed under the

*Warren Five Cents Sav. Bank*, 409 Mass. 73 (1991), the Massachusetts Supreme Court reversed a grant of summary judgment, finding there was a question of fact as to whether plaintiff determined in good faith that his golden parachute was triggered by a merger and subsequent demotion because his retention plan required a "significant" demotion before benefits were triggered.   Here, any diminution in status or office or title is sufficient.

In *Worth v. Huntington Bancshares, Inc.*, 43 Ohio St. 3d 192 (Ohio 1989), the common pleas court held a bench trial at which plaintiff offered evidence that his position had been diminished after a merger because the importance of his division was reduced in the new company.  The trial court found there was actually evidence that plaintiff's status in the new company was increased.  There was also evidence that plaintiff quit because the term of his retention plan was about to expire, after which a diminution in duties would not trigger the payment of benefits.  The trial court held that the alleged diminution was not plaintiff's reason for resigning and the appeals court and supreme court affirmed on this point.  There was no evidence that plaintiff's plan would have been triggered by a diminution in title or that

<hr />

"arbitrary and capricious" standard rather than the *de novo* standard that applies here (the plan in *Bader* granted the administrator discretion in awarding benefits).  Plaintiff alleged a "material and adverse change in responsibilities" triggering his severance payments.  Under the plan at issue, the administrator had the discretion to determine if "good reason" existed for a participant's resignation and demand for benefits.  After a merger, plaintiff was offered the same position he had pre-merger.  Then, plaintiff quit. The plan administrator, acting in his discretion, denied benefits. Because the administrator had discretion under the plan to make such a decision, the court reviewed the action under the deferential "arbitrary and capricious" standard and found the administrator acted within his discretion.

23

his title was changed.

In *Collins v. Ralston Purina Co.*, 147 F.3d 592 (7th Cir. 1998), plaintiff remained in his same position after a merger.  Months later, he was offered a different job that he perceived to be a "substantial reduction in responsibilities."  He declined the offer and quit asserting his retention plan benefits had been triggered.  After trial, the district court granted judgment to defendants.  Because a trial had been conducted, the appeals court reviewed the trial court's findings to determine if they were "clearly erroneous."  The court of appeals affirmed stating there was no evidence on the record that merely making a new job offer to plaintiff that might result in a reduction in duties constituted an actual reduction of those duties.  There was no evidence that it was a "take it or leave it" offer.  So, plaintiff couldn't prove that he necessarily experienced a substantial reduction in responsibilities, as required under his plan.  This case does not establish, as defendants would have it, that Minahan did not suffer any diminution in duties because she did not stay with LESCO long enough after the merger to see if her job changed at all.  She was no longer Secretary; that was enough.

Similarly, *Vry v. Martin Marietta Materials*, 2003 U.S. Dist. LEXIS 1974 (D. Minn. 2003), was decided after a trial on the merits.  Plaintiff argued his plan was triggered because both his compensation was reduced and his duties were "meaningfully" diminished after a merger.  The court found that there was no evidence his compensation was reduced.  And, the court found that the evidence adduced at trial did not support a claim that his duties had been meaningfully altered.

For the reasons discussed, plaintiff's motion for summary judgment on Count II of the First Amended Complaint is granted.  Defendants' motion for summary judgment on this

24

same count is denied.[8]

## C.    Count III of Plaintiff's First Amended Complaint - Payment of Fees

Plaintiff moves for summary judgment on Count III of her First Amended Complaint (Doc. 42).  Plaintiff alleges that defendants' failure to pay her legal fees and expenses as incurred in bringing her claim violates 29 U.S.C. § 1132(a)(1)(B).  Plaintiff further seeks specific performance pursuant to 29 U.S.C. § 1132(a)(3).[9]

The Retention Plan provides:

> The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Employee may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, the Employee or others of the validity or enforceability of, or liability under, any provision of the Plan or any guarantee of performance thereof (including as a result of any contest by the Employee about the amount of any payment pursuant to this Agreement) ...  Notwithstanding the foregoing to the contrary, the Company shall not pay fees in excess of $100,000.

Retention Plan at 8.

---

[8]

Having found that plaintiff can prevail by showing she was no longer Secretary of LESCO after the merger, the Court declines to address her alternate theory that her HR duties were diminished.

[9]

Some of plaintiff's legal fees are being paid by defendants' insurer, Chubb, pursuant to an Employed Lawyer Liability policy.  As a result, defendants complain that they should not have to pay as well. Plaintiff states that Chubb is only covering the expenses incurred in defending against defendants' counterclaims.  Accordingly, she states that her motion for summary judgment on Count III of her First Amended Complaint is limited to those fees and expenses incurred in bringing her affirmative claim.  The motion is not directed to defendants' liability for fees and expenses incurred in defending against the counterclaims.  Pl. Mot. at n.1 (Doc. 42).

As stated above, a denial of benefits under an ERISA plan is reviewed *de novo*.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  The plan provisions are to be

construed according to "their plain meaning, in an ordinary and popular sense."  *Perez v.*

*Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998).

Defendants argue that plaintiff's fees were not "reasonably incurred."  They rely

heavily on the fact that Deere offered to pay her severance benefits only if she would attend

the May 10 "legal download" meeting.  Defendants also point to plaintiff's contentious

behavior during this litigation.  Plaintiff counters that because defendants are liable for her

fees "regardless of the outcome" of the litigation, the reasonableness requirement relates only

to the amount of the fees incurred and not to the merits of her underlying claim.

Both the Seventh and Eighth Circuit Courts of Appeals have held that similar contract

language requires that both the legal time spent *and* the claim itself be reasonable for fees to

be "reasonably incurred."  In *Curby v. Solutia, Inc.*, 351 F.3d 868 (8th Cir. 2003), the court

stated that an interpretation to the contrary would mean that the company has written a blank

check.  The court held that plaintiff's claim was unreasonable because it was undisputed that

there had been no change in control when she asserted her right to benefits under her retention

plan.  It denied her payment of her attorneys' fees.

In *Gerow v. Rohm & Haas Co.*, 308 F.3d 721 (7th Cir. 2002), the court similarly

stated that

> an opportunity to litigate on the adversary's dime, without any
> need to prevail in order to collect, creates a moral hazard, which
> is mitigated by the requirement that the fees be incurred
> 'reasonably.'  Like the district judge, we read the word
> 'reasonably' in context to curtail this hazard by requiring not only
> that the time devoted to advocacy must be reasonable in light of

26

> the litigation's nature (a requirement in every fee-shifting situation) but also that the litigating position must be 'reasonable (a filter necessitated by the promise to reimburse even if the claim is unsuccessful).

Plaintiff attempts to distinguish *Curby* and *Gerow* on the ground that LESCO's exposure on attorneys' fees is capped at $100,000.  As a result, plaintiff argues that defendants need not worry that she will litigate *ad infinitum*.  She states that she has every incentive to litigate her case efficiently.  However, $100,000 in fees is not to be dismissed so easily as an insubstantial figure.  And, the decisions discussed above are not drawn so narrowly as to suggest a different outcome when there is some cap on the exposure to the company.  The plain language of the Retention Plan on the matter of fees supports a conclusion like the ones reached by the *Curby* and *Gerow* courts.

Having determined that plaintiff must show both the amount of fees and her litigation position are reasonable, the Court turns to whether it can be said that plaintiff's fees have been "reasonably incurred" as a matter of law.  Based upon the above determination that plaintiff determined in good faith that she was resigning for Good Reason, the Court finds that her fees have been reasonably incurred.

Plaintiff's motion for summary judgment on Count III of her First Amended Complaint is granted.

**D.      Count I of Defendants' Second Amended Counterclaim - Declaratory Judgment**

Plaintiff moves for summary judgment on this count (Doc. 66).  Defendants seek a declaratory judgment that there was no "Triggering Event" and plaintiff did not resign for "Good Reason."  As detailed above in Section B, the Court finds that there was a Triggering Event and plaintiff in good faith resigned for Good Reason with respect to plaintiff's

27

secretarial status. Accordingly, plaintiff's motion for summary judgment on Count I of defendants' Second Amended Counterclaim is granted.

**E.  Count II of Defendants' Second Amended Counterclaim - Breach of Contract**

Defendant LESCO moves for summary judgment on Count II of its Second Amended Counterclaim (Doc. 63). Plaintiff also moves for summary judgment on this count (Doc. 66). Defendants allege that plaintiff breached the 2004 and 2005 Officers' Agreements (collectively, the "Officers' Agreement") in that she failed to return all documents containing LESCO's confidential information and she solicited and encouraged LESCO employees to resign in the wake of the merger with Deere.

To prove a breach of contract claim, LESCO must show the existence of a contract, performance by LESCO, a breach by Minahan and damage or loss to LESCO. *E.g., Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881 (Ohio App. 2002) (quoting *Nilavar v. Osborn*, 738 N.E.2d 1271, 1281 (Ohio App. 2000)).

It is undisputed that the Officers' Agreement was in effect when plaintiff terminated her employment with LESCO. It is also undisputed that LESCO performed its obligations under the Officers' Agreement. As stated above, defendants assert two grounds for their breach of contract claim - that plaintiff retained "Confidential Materials and Information" and that she solicited employees to leave LESCO in contravention of the terms of the agreement.

A.  *Retention of Confidential Materials and Information*

It is undisputed that plaintiff retained LESCO documents upon her resignation and that these documents meet the agreement's definition of "Confidential Materials and Information." Plaintiff states that she was given permission to retain her BlackBerry device

upon resignation.  She argues that this grant of permission amended the Officers' Agreement.  However, an agreement to allow her to retain the device is not an agreement to allow her to keep the documents on it.  Moreover, the Officers' Agreement explicitly provides that "no modification, waiver, or amendment to any of the terms of this agreement shall be effective unless set forth in a writing signed by employee and employer."  Officers' Agreement, Section 6.  Even plaintiff's ethics expert, Attorney Geoffrey Stern, admitted at deposition that if a lawyer is asked to return privileged information to a company, she is required to do so.

The Court finds that plaintiff breached the Officers' Agreement when she retained the confidential documents on her BlackBerry after her resignation.  She took her BlackBerry with her after she resigned.  The BlackBerry contained over 10,000 pages of LESCO documents subject to return under the Officers' Agreement.  Plaintiff failed to return these documents for more than one year and only after repeated requests and initiation of the breach of contract counterclaim.  Plaintiff also "downloaded" these documents from her BlackBerry to her personal computer.  Plaintiff's briefs fail to grasp the difference between permission to retain the BlackBerry device and her obligation to return the information stored on that device.  Her argument that LESCO already possessed the documents and information also fails.  Her contractual obligations are not in any way dependent upon whether or not LESCO also had copies of the documents.

As to damages, defendants point to Section 3(f) of the Officers' Agreement which states that "Employee agrees that a breach of any covenant in this Paragraph 3 [including the non-solicitation and confidential information provisions] will cause Employer irreparable injury and damages for which Employer has no adequate remedy."  This provision further

provides that "if Employee has violated any covenant in this Paragraph 3, Employee will pay all litigation costs and expenses and Employer's reasonable attorney fees necessarily incurred in the litigation, in addition to any other remedies to which Employer may be entitled." Defendants also point out that plaintiff disclosed LESCO's attorney-client confidences to her personal counsel in the course of this litigation.  *Zahodnick v. IBM*, 135 F.3d 911 (4th Cir. 1997) (affirming grant of summary judgment to former employer where former employee took confidential documents and disclosed them to his attorney without consent of employer).

Plaintiff argues that defendants' claim must fail for the simple reason that they failed to "specifically allege" their damages or submit a calculation of actual damages.  The Court does not agree that such evidence is required at this stage of the proceeding; defendants' production of the Officers' Agreement that provides for contractual damages is sufficient. She also states that defendants failed to mitigate their damages by, among other things, failing to "remotely" erase the documents from her BlackBerry after she resigned.  Plaintiff fails to address the contractual provision regarding damages and payment of all litigation expenses.

The Court finds that defendants suffered damages as a result of plaintiff's breach and are entitled to recover the resulting "litigation costs and expenses and Employer's reasonable attorney fees necessarily incurred in the litigation, in addition to any other remedies to which Employer may be entitled" under Section 3(f) of the Officers' Agreement.

B.      *Attempt to Induce or Influence LESCO Employees to Resign*

Section 3(b) of the Officers' Agreement provides that "Employee, acting either directly or indirectly, or through any other person, firm, or corporation, will not induce or attempt to induce or influence any employee of Employer to terminate employment with

Employer when Employer desires to retain that person's services."  The agreement was entered into to protect the "confidential information regarding ... prospects and employees ... not known to the public ... giving Employer an advantage over competitors not aware of such [information]."

Defendants state that plaintiff "influenced" and "encouraged" others to leave LESCO upon the closing of the merger with Deere by stating in an email to another LESCO employee that if the executives were demoted they were "all going to walk on May 7."  Plaintiff also stated in an email to a LESCO employee that Deere "had better start negotiating deals" with the executives.

Perhaps more significantly, defendants state that plaintiff had several conversations with other LESCO executives in late April 2007.  When asked whether plaintiff "solicited" him to leave LESCO, CFO Michael Weisbarth testified at deposition that he, plaintiff and two other executives had an informal conversation at which they discussed whether or not their benefits would trigger at closing and whether or not they should seek personal attorney representation.  Mr. Weisbarth testified that plaintiff "had suggested to myself and other executives that it would be -- looking for the right word -- appropriate to leave so as not to continue working after the triggering events occurred."  He also testified that "she suggested that we should [terminate our employment at LESCO at closing]."  According to Mr. Weisbarth, plaintiff "made a comment that the longer we continued to work after the merger or after the closing, then we were implicitly agreeing ... that our retention agreements did not trigger."  The executives also discussed whether they would also risk being fired for cause (in which case their retention benefits would not trigger).

31

LESCO's CIO Kevin Wade, on the other hand, testified that plaintiff "felt for our protection we should garner some type of advice and that if we wanted to do it as a team she could assist in that process."  He added that plaintiff "made [it] very clear" that "she could not give [him] personal advice" and that "she did not give [him] any legal advice."  He also testified that plaintiff did not recommend that he leave LESCO.  He stated that she did not talk about leaving the company; what she did was "ask if we felt it made sense to get legal advice."

Defendants further rely on an email plaintiff sent to her personal counsel Michael Frantz after the meeting with these other executives.  The email stated that "my fellow executives and I may need some legal advice and/or representation concerning our respective situations vis-a-vis Deere and our retention agreements."  Mr. Weisbarth testified that he gave his permission for plaintiff to include his name in the email to Attorney Frantz.

Plaintiff testified that at the meeting with her fellow executives she was merely offering her legal opinion after being asked for it; she was not encouraging anybody to quit. She also points out that none of these executives actually did quit at closing.  Rutherford testified that "there was no impropriety" in what plaintiff said or did when the executives discussed their interpretation of the retention plan.

On this evidence, the Court finds that plaintiff did not "induce or attempt to induce or influence" any LESCO employee to resign.  Mr. Weisbarth's testimony that plaintiff "suggested" that the executives resign is insufficient to find otherwise.  Further, the Officers' Agreement itself provides that it was entered into to protect LESCO's confidential employee information not known to competitors.  This is not a case in which plaintiff went to work for a

competitor and tried to recruit other LESCO employees to join her.

For the reasons stated above, defendants' motion for summary judgment on Count II of their Second Amended Counterclaim is granted in part and denied in part.  Plaintiff's motion for summary judgment on this count is likewise granted in part and denied in part.

**F.      Count III of Defendants' Second Amended Counterclaim - Breach of Fiduciary Duty**

Defendant LESCO moves for summary judgment on Count III of its Second Amended Counterclaim (Doc. 63).  Plaintiff also moves for summary judgment on this count (Doc. 66).  Defendants allege that plaintiff breached her fiduciary duties of good faith and loyalty, her duty to refrain from self-dealing and her duty of disclosure to LESCO.  Plaintiff's alleged breaches include her attempts to influence fellow officers and employees to resign, putting her personal economic interests before LESCO's best interests and refusing to attend a post-merger meeting at which she was to impart her legal knowledge to Deere and failing to inform LESCO that a new BlackBerry policy might lead to former employees' retention of LESCO's confidential and proprietary information.

To prove a breach of fiduciary duty, LESCO must show that plaintiff had a duty not to subject LESCO to the injury complained of, that she failed to observe such duty and that LESCO suffered injury proximately resulting from plaintiff's failure.  *Strock v. Pressnell*, 38 Ohio St. 3d 207, 216 (1988).  Plaintiff does not dispute that she owed fiduciary duties to LESCO as an officer and as General Counsel.

> In Ohio, a fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtues of this special trust. It is well-established that

33

> a corporate officer occupies a fiduciary relationship to his or her employer and that this relationship imposes upon the officer a number of duties, including good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure. In considering whether the fiduciary has breached one or more of these duties, intent is not relevant; rather, as long as the fiduciary places himself in a position of conflicting loyalties and subsequently violates his duty of trust and benefits at the expense of the corporation, liability attaches.

*De Boer Structures v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 953 (S.D. Ohio 2002) (internal citations omitted); *see also* Ohio Rules of Professional Conduct ("Prof. Cond."), Rule 1.7, Comment 1 ("The principles of loyalty and independent judgment are fundamental to the attorney-client relationship and underlie the conflict of interest provisions of these rules. Neither the lawyer's personal interest, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to the client.").

Defendants argue that plaintiff had a duty to act reasonably:

> As part of the termination of representation, a lawyer shall take steps, to the extent *reasonably* practicable, to protect a client's interest. The steps include giving due notice to the client, allowing *reasonable* time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules. Client papers and property shall be promptly delivered to the client. "Client papers and property" may include correspondence, pleadings, deposition transcripts, exhibits, physical evidence, expert reports, and other items *reasonably* necessary to the client's representation.

Prof. Cond. Rule 1.16(d) (emphases in original). They also argue that, in terminating her representation of LESCO, she had a duty to "take all reasonable steps to mitigate the consequences to the client." *Id.* at Comment 9. This duty attaches even when the attorney has good reason to withdraw and even if the attorney was unfairly discharged. *Id.* at

34

Comment 8A, 9.  The duty includes the obligation to "cooperate with counsel subsequently employed."  *Id.* at Comment 8A.

Plaintiff argues that her conduct was reasonable and that, in any event, defendants suffered no damage.  The parties offer dueling expert opinions on the matter.  Each points to the same conduct and reaches different conclusions on whether or not plaintiff's actions amounted to a breach of her fiduciary duties.

A.      *Plaintiff Declined to Attend May 10 Meeting*

LESCO argues that plaintiff had an ethical obligation to prepare for her withdrawal from her representation of LESCO and to minimize any disruption to her client that might arise from her resignation.  LESCO claims that she put her own interests first when she declined to attend the May 10 "legal download" meeting unless she received a written commitment that the company recognized a Triggering Event as of the close of the merger.  LESCO also argues that these same actions breached plaintiff's duty to cooperate with subsequent counsel - *i.e.*, Deere's incoming legal staff.

Defendants' expert Attorney John Sahl opines that plaintiff had a duty to "make sure that there was somebody who was in a position to facilitate [the] transition."  Plaintiff's paralegal attended the May 10 in her stead.  While Deere was happy with the paralegal's grasp of pending legal matters, it is undisputed that plaintiff held knowledge that the paralegal did not.  In the days leading up to the merger, plaintiff also outsourced work to outside counsel without informing LESCO or Deere.  While LESCO's counsel try to make much of this fact in their briefing, Rutherford testified - as to at least one matter that was sent to outside counsel - that plaintiff did not act improperly in doing so.

35

She did inform those with whom she worked that she would be leaving her position. But, she did not prepare a memo or otherwise document all of the pending matters for which she was responsible. Plaintiff claims she updated an electronic database with this information, but she has no evidence supporting this statement. Plaintiff notes that no SEC filings, court filings or HR matters were missed or "fell through the cracks" according to defendants' own witnesses. However, when asked in the days leading up to the merger who the new legal contact would be, she simply stated "I don't know." She never contacted LESCO's CEO or anybody else to confirm who would be the legal contact going forward.

Plaintiff's expert, Attorney Geoffrey Stern, of course opines that there was no ethical requirement that plaintiff attend the legal download meeting. He opines that leaving documentation of pending legal matters with a paralegal is not a violation of the code of professional responsibility. He also testified that assigning work to outside counsel was within plaintiff's discretion and not an ethical violation and "in point of fact, [is] probably an example of diligence, which the new rules promote." While he did admit that the manner in which plaintiff handled her departure might not constitute a "best practice" in terms of "professionalism" he stated that her behavior could not be considered a breach of fiduciary duties. Plaintiff also relies on a statement from LESCO CEO Jeffrey Rutherford that he believed that before the merger plaintiff had always respected her duties to the company: "[she] always had the company's -- she understood her fiduciary responsibility and had the company's interest."

As to damages, defendants argue that they are entitled to recovery of plaintiff's salary from the time she stopped working in LESCO's best interests to the time she resigned. The

Court rejects this theory of damages on the facts presented.  In the law relied upon by defendants, an Ohio appeals court held that damages for breach of fiduciary duty may be based at least in part on the salary paid to the breaching employee.  *Holiday Props. Acquisition Corp. v. Lowrie*, 2003 Ohio 1136 (Ohio App. Ct. 2003).  In that case, however, the employee had formed his own company to compete with his employer while he was still employed.  During that time, the employee also solicited his employer's customers to become customers of his own company.  Plaintiff's alleged actions do not go so far here.

Defendants also argue they are entitled to be compensated for the legal costs incurred in having outside counsel perform work that might otherwise have been performed at LESCO. Defendants also argue that LESCO was required to spend additional time and money preparing and reviewing various SEC filings that plaintiff would have reviewed had she remained with the company after closing.  Mr. Weisbarth was also required to take time from his regular duties to assist plaintiff's paralegal with various legal matters after the merger. Mr. Weisbarth also testified that Deere was adversely affected by plaintiff's resignation in that review of invoices from outside counsel had to be conducted by another.

Plaintiff responds that defendants were not damaged.  She states that whether LESCO spent more on outside counsel is purely speculative.  She further argues that to the extent somebody else might have had to perform her duties, defendants must subtract from their damages the fact that they were no longer paying her salary.  She also relies on Rutherford's testimony that "I can't prove that there wasn't any upside to her being [at the May 10 meeting].  I can't answer the question because it's asking me to answer a question that we will never know because it's not a measurable question."

37

The Court agrees with plaintiff that LESCO has offered no evidence that it was damaged by the way she handled her resignation and withdrawal from representation. Because injury is an element of a breach of fiduciary duty claim, LESCO's claim must fail.

B.      *Plaintiff Attempted to Induce other LESCO Executives to Quit*

LESCO alleges that plaintiff's conversations with other LESCO executives in which they discussed whether or not their retention benefits would trigger at closing were a breach of fiduciary duties.  As discussed above in connection with the breach of contract claim, defendants believe that plaintiff's conduct was an attempt to influence these other executives into adopting her position and to resigning at closing.  In doing so, she arguably placed her interests or those of the executives ahead of her client's interests.  Plaintiff argues that she was merely offering her interpretation of the Retention Plan and then informed the other executives that they should obtain their own counsel if they wished.

LESCO responds that plaintiff's email to Attorney Frantz in which she stated that her fellow executives might be in need of legal advice or representation concerning their retention agreements went "well beyond" informing the other executives that they could obtain personal counsel should they wish to do so.  Moreover, plaintiff knew that LESCO wanted to keep the executive team in place after the merger.

Plaintiff's expert opines that going to outside counsel for an opinion cannot be a breach because it assumes that the employees will be adverse to the company before they know whether that is the case or not.  Taken to its logical end, plaintiff's expert opines that no lawyer ever could consult counsel.  Of course, this is not exactly the point; the point is whether she encouraged others to do so knowing that the outcome of such consultation could

be adverse to the company.

However, LESCO does not present any damages it alleges to have suffered as a result of plaintiff's supposed encouragement of other executives to resign.  In fact, as stated above, Deere's Senior VP Mr. Werning testified at deposition that "to the extent [plaintiff] encouraged people to leave, she was unsuccessful in that.  So, specific to that, no, there would be no damage."  Given the lack of evidence, the Court must find that LESCO suffered no damage as a result of plaintiff's conversations with LESCO executives in which she suggested they obtain outside counsel or resign.

    *C.*      *The New BlackBerry Policy*

Finally, defendants point to plaintiff's suggestion to LESCO's CEO that employees be allowed to keep their BlackBerries after termination.  Defendant's expert opines that plaintiff had a duty to affirmatively inform Mr. Rutherford that, as a result of her proposal, employees might leave with confidential information in their possession.  He states that this circumstance is one in which "informed consent is required."  Prof. Cond. Rule 1.4(a).  As such, plaintiff should have provided Rutherford with "sufficient information to participate intelligently" in the decision.  *Id.* at Comment 5.  The Court disagrees and finds that plaintiff had no fiduciary duty to tell LESCO that if an employee retained his BlackBerry he might possibly take confidential information with him.  Rutherford, the CEO of LESCO and "embodiment of plaintiff's client," had a BlackBerry himself.  He clearly knew or and was familiar with at least the basic capabilities and functions of the device - that it holds email messages and attachments thereto.  As such, he reasonably should have known that a BlackBerry might contain confidential information on it.  Plaintiff had no fiduciary duty to inform him of this

39

elementary fact.

LESCO's motion for summary judgment on Count III of its Second Amended Counterclaim is denied.  Plaintiff's motion for summary judgment on this count is granted.

**<u>CONCLUSION</u>**

For the foregoing reasons, plaintiff's motion for summary judgment on Count III of her First Amended Complaint is GRANTED.

Defendants' motion for summary judgment on Counts I and II of plaintiff's First Amended Complaint is GRANTED as to Count I and DENIED as to Count II.

LESCO's motion for summary judgment on Counts II and III of its Second Amended Counterclaim is GRANTED in PART and DENIED in PART as to Count II and DENIED as to Count III.

Plaintiff's motion for summary judgment on Counts I and II of her First Amended Complaint and Counts I, II and III of defendants' Second Amended Counterclaim is DENIED as to Count I and GRANTED as to Count II of her First Amended Complaint and GRANTED as to Count I, GRANTED in PART and DENIED in PART as to Count II and GRANTED as to Count III of defendants' Second Amended Counterclaim.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan             
PATRICIA A. GAUGHAN
United States District Judge

Dated:   9/5/08

40